Caldwell St Good morning, your honors. Thomas Roger on behalf of the appellant. Good morning, your honors. Ellen Sifford on behalf of the Board of Trustees of Morton Grove Firefighters Association. And Jolica on behalf of the Village of Morton Grove. I'll just need you to announce your names. Roger. Okay, now we are... Pardon? I'd like the two of you... The Village of Morton Grove and the Board are represented by separate counsels. So, the two of you should decide how you want to divide your time, because you still have 15 minutes. You don't get 15 minutes each, you still have 15 minutes. Okay, so it's fine. How are you going to do that? Anytime you're ready. May it please the court, as I mentioned, my name is Thomas Roger on behalf of Firefighter Darren Williams. I would like to reserve five minutes for rebuttal. It's okay with your honors. This case involves a 15-year veteran of the Morton Grove Fire Department, a 42-year-old firefighter who was injured in the line of duty on September 26th and aggravated that injury the next day on September 27th while at work in 2003. His next duty shift, as you know, firefighters work one day on, two days off. In this particular case, he had happened to work two days in a row because he had made duty trades with other firefighters. His next duty shift after the 27th, when he had re-injured his right shoulder, he immediately notified his lieutenant. Isn't there some dispute about that? It was called immediately, not being two days later. The lieutenant who was in charge of the shift when the injury allegedly occurred claims that he would never have instructed Mr. Williams to wait until he went to his regular lieutenant to make the report. Right. Right, Your Honor. That's part of the, that's a big issue here. They're claiming that the injury could not have occurred at the time and place and so on. On the 26th was when he initially was moving the patient from a gurney to a hospital bed and he felt a pop and pain in his shoulder. I know what his testimony is. I'm just asking about your statement that he, quote, immediately notified. And they take issue with that. Right. Because this allegedly occurred either on Friday or Saturday and I think the notification was done on Monday. Right. The firefighter testified he had notified Lieutenant Brown, who wasn't his normal supervisor, wasn't his shift supervisor. Lieutenant Brown had said, notify your shift supervisor. Lieutenant Brown testified that he would never have told him that. He said if it was a significant, very painful injury, I would have took him to the hospital right away and would not have told him that. I think that's where the dispute comes in is that firefighter Williams actually said this wasn't a life-threatening thing. He certainly didn't expect this to end his career on this day. As I read the material, Lieutenant Brown said if there is an injury, he didn't say anything about it being life-threatening. If there was an injury, he would have immediately made a report and made the person be transported to the hospital. That was his testimony. I agree. That was a question of fact for the board to decide as to did Lieutenant Brown say notify your shift supervisor or was he not told about the injury altogether. However, be that as it may, when Lieutenant Thurmond, firefighter Williams' regular supervisor, was notified, he had firefighter Williams immediately fill out an injury report, which he did. A two-page report, which was contained in the record, which outlined what happened on both of these particular days with his shoulder. The chief sent him immediately for treatment at Advocate Health Center, which is the fire department facility that they normally utilize. Within a day of that, firefighter Williams was seeing his own treating physician, who had injected his shoulder with a cortisone injection for the pain. Firefighter Williams was off for a couple of weeks. He returned to work full duty on October 14th of 2003 and worked full duty up until the time of his first surgery in March. The fact that firefighter Williams continued to work through this injury, the village and the board will say, well, he really didn't have a significant injury because he was able to work. But what they forget about is that he had an injection for that pain to his shoulder. You know, I'm a doctor. So I really don't know what the next play is. I mean, it's sensitive, but I really don't know. So what I'm really concerned about is the experts. Ultimately, don't we have to defer to some degree to their expertise as to what occurred? I think the pension board had to do that as well. And as you'll see from the record, the firefighter was evaluated by six physicians based on his right shoulder injury. Three of them that were selected by the pension board, Dr. Moisen, Dr. Seidel, and Dr. Samel. Two of the doctors, Dr. Moisen and Dr. Seidel, unquestionably said this is a duty-related injury that has rendered him disabled from full-duty firefighter duties. Dr. Samel was a little bit unclear in his report initially. I'm not getting to where he testified before the board. In his report, he said he sustained an injury. It looks to me like that resolved within two weeks because he was able to return to work. I didn't have the initial treatment records when I evaluated him, so I'm not entirely sure. Dr. Samel did testify. The other two doctors that I said unquestionably said this was a duty-related injury did not testify. But Dr. Samel, during his testimony, said the firefighter is disabled, and the reason is because he has a frozen shoulder. Adhesive capsulitis was the medical term for it. And he said, I would defer to the treating physician as to what the cause is. I don't know what the underlying condition is with the shoulder because I can't tell if the shoulder is frozen. But I would defer to the treating physician, who is Dr. Sklamberg, that this was an extension, I think was the word that Dr. Samel used, an extension of his work-related injury. So I think during... Do you believe that Samel supports the duty? I do, and in my brief, I cite it to the actual testimony, where I think Dr. Samel's testimony supports that this, in fact, the frozen shoulder is a result of the two surgeries that, but for his work-related injury in September, would not have happened. The question is, did the surgeries, the injuries, the surgeries were performed to repair, what was the injury? Did the injury occur while he was on duty for that? It doesn't matter if he had surgery or not. The question is, what was the original injury? Right, and I think all the doctors... First of all, none of the doctors can point to any other cause, any other injury other than at work, I guess is the best way to put it. There was no evidence that the firefighter had injured his shoulder while doing weightlifting, as the village and the board may point out, or that he was in valleys and lifted too much weight. Well, you say there was no evidence. There might not have been evidence that you like, but there was evidence that he had been doing bench presses of up to 130 pounds and that nobody, no medical person had told him to do that. He was kind of doing that on his own in his basement at one time when he may have re-injured his shoulder. Couldn't the board take that into consideration? Firefighter Williams admitted that he was bench pressing 130 pounds in his basement. However, he was trying to get back to being a firefighter, and that's why he did it. And this wasn't a re-injury. His shoulder was still sore. He was in physical therapy at the same time that he was trying to lift weights and get back to being a firefighter. There was no medical evidence that suggested he was at home and there was another re-injury or that this thing was stretched too far and made his shoulder worse. There was testimony, yeah, I was lifting weights, and I felt sore. Or the doctors would ask him, you know, what are you doing at home? How was the shoulder feeling? He said, hey, I was trying to lift weights and my shoulder felt sore. Well, let me ask you, this is a real basic question, but it's your burden of proof. It's the plaintiff's burden of proof. So isn't it your responsibility to bring whatever evidence you need to before the board to convince them that that September 2003 injury was either the cause or the contributing factor that now ended up with this plaintiff being totally permanently disabled? Absolutely, Your Honor. And I think Firefighter Williams did that. I mean, there was six physicians that said, but for this September work injury, pardon me, there was five physicians. Dr. Freeburg unequivocally said, no, his work injury wasn't caused by his injury. But the other five physicians, I think even Dr. Samel, when you read his testimony carefully, they all say that this work injury is what led to the two surgeries in March and August. Dr. Freeburg is the only physician that says, no, it didn't, and he never evaluated Firefighter Williams, never talked to Firefighter Williams about the injury, except that there are records of it. I still have some problems with Dr. Samel. That's because I'm not really the same way you are. Doesn't Dr. Samel say the plaintiff had a minor injury which seemed to resolve very quickly? My sense of it, and let's go back and read it more carefully, that Dr. Samel, ultimately his opinion is that the frozen shoulder that arose after the various surgeries was not caused by the injury that took place on duty. And I believe, isn't that what he felt as he said? In the initial report, Your Honor, that's what he does say. But when he testified before the Board, he admitted that when he did his report, that that opinion was pure speculation, that he didn't have anything to support the fact that he thought there was some subsequent injury that led to the surgeries. And I can point you to the record at page 1645 and 1646. Dr. Samel opined during his testimony that what caused the slap tear, and that was the tear to the tendon or the ligament in the shoulder, that he said that what caused it, he would rely upon the opinion of plaintiff's surgeon who believed it was an extension of the original injury that was surgically repaired in March of 2004. And plaintiff's treating physician had clearly indicated from the onset that the slap tear was caused by the work-related injury. Unfortunately, there was no MRI that was performed right after the work-related injury that would have shown, look, there's a slap tear here. But didn't Samel also, I think there's an issue here about credibility of the firefighters. And I kind of ran through a number of these. So I understand when you say this is our evidence, that's the evidence that's presented, but certainly there was a suggestion that not all of it should be accepted at face value. Including Dr. Samel said that, doesn't he? That he thinks that there are inconsistencies between the history provided by the plaintiff and the information from the medical report? I've heard the board argue and the village argue that there's inconsistencies. I haven't seen what those inconsistencies are, other than them saying he was trying to do too much in physical therapy or by exercising the shoulder. I haven't heard any explanation from the board or the village as to what the inconsistencies are between Firefighter Williams' explanation and the actual injury that resulted from the work injury. Didn't the board hear testimony from doctors essentially kind of falling into two categories? Number one, I think just about all of them agreed there was an injury. Whether it was the 26th or 27th, there may have been some confusion, but there was an injury. Then there was a group of doctors that say that injury caused, was the direct cause of these surgeries that he had. Then there were some other doctors, maybe only one, I don't recall exactly, who said he was injured, that was resolved, these are the result of something else. We don't know what, I don't know what or whomever. Isn't that, is that basically correct? And really what happened here is the board heard all this and they fought the argument that it was resolved and this stuff was not the result of this injury that he had suffered on that day. I think you're basically correct initially, but I think once the testimony of the category, Dr. Samuels found that category of, yeah, he was injured, but it resolved. But he testified during the hearing that there really was a slap tear at least as early as February of 2004. And the slap tear wasn't diagnosed until it actually went in and did surgery on this individual. So for the doctor to say, you know, it had to be something else and it resolved within three weeks without the benefit of an MRI or some objective medical evidence. Apparently it was good enough for the board. You know, I mean, how else can you resolve, you know, with their conclusion? You know, and they viewed all, they heard all this testimony both from the doctors and everybody else, and they made a decision. It seems to me, correct me if I'm wrong, what you're asking us to do is say, well, yeah, that was there, but we want you to take the other view. Well, that is what I'm saying, Judge, and I think there's reason behind it. When I say you don't, you raised an excellent point. I think the reason why, Your Honors, you have to look at Dr. Samo and Dr. Freeburg's reports and their testimony closely, those were the two dissenting doctors that the board chose to rely upon. Isn't that the board's prerogative? It is, Your Honor, but the case law in Illinois says if you're going to select the sole dissenting doctor or the minority opinion, you should set forth a basis for why you chose to disregard those other five doctors or four doctors and why you chose this one specific doctor. Well, the board did set forth a basis. You may not agree with it, but they did in a very limpy opinion. They did talk about the mechanism of the injury and the fact that Dr. Freeburg was the only one that really went into that and so on. You take considerable issue with that because Dr. Freeburg apparently had never laid eyes on the plaintiff and essentially formed his opinion based on the review of records and not all the records. The defense counsel cited Dr. Freeburg's testimony where he said, when I'm giving a causation opinion, 90% of that is from talking to the hurt individual. The other 9% is from looking at how the injury occurred, and that makes up 99% of my opinion. Dr. Freeburg never looked at Firefighter Williams and didn't know what the mechanism of injury was. The board happily says, well, we chose Samo and Dr. Freeburg because they analyzed the mechanism of injury. Both of those doctors testified. Dr. Samo says, I didn't have the initial treatment records and wasn't sure what the mechanism of injury was, and so did Dr. Freeburg. And Dr. Freeburg says it at page 1822 of the record. I didn't know what the mechanism of injury was.  Then this injury would have never happened the way he described it. Firefighter Williams' testimony, unrebutted, clear testimony, was I reached over with palms down and moved over the firefighter onto the bed, and that's when I felt the pain in the back. So to credit Dr. Freeburg's testimony, because he analyzed the mechanism of injury, is against the manifest way to the evidence. There was no evidence to support that he looked at the mechanism of injury, and that's what they rely upon. When you say several times in their brief, these two doctors looked at the mechanism of injury. Well, I think what we're troubled by is, isn't this what fact finders do? We're here in administrative review, incredibly deferential standards in terms of fact finding. It's really hard for us, sitting here, not seeing the injury. I mean, just how the system is set up. We weren't there. We didn't see the witnesses. It's an incredibly high standard that you have to show. Could I move you a little bit to your legal arguments, where I think you make an interesting distinction between just what are the facts and how do they decide the facts, because, again, it's really hard for us to overturn that fact finding. You're making a very clear argument here that in this specific case, we should not rely on the board because you suggest that it was not fair and it was not impartial. It was biased. It was this. It was that. And so, unlike our general standard review, we should be looking at this in a different way. So, could I move you a little bit to those legal arguments? Sure. I'd be happy to judge you. I'm really interested, and when I say that, I'm seriously interested. I just don't know the answer to this, to the whole idea of intervention. It's really interesting, looking at these cases, that we don't see this issue coming up, where a village has been allowed to intervene and there's some kind of exception. I understand stigma, but that's the other way around. There, the board didn't allow intervention. So, it appears, it's just sort of interesting to me that we don't have any cases like this. You don't see these cases, Judge, because the village, at least in my nine years of representing pension boards and applicants before pension boards, you didn't see villages intervene because there wasn't the Crowley decision by the Supreme Court where they said to get health insurance benefits for you and your family, you have to show that you're catastrophically injured. So, that's not what our case is about, really. It's about, but you're saying because there's more financial interest, more villages are intervening. Is that right? Right. The decision came down saying if you're granted a line-of-duty disability before a pension board, that's one problem, and you have to get health insurance benefits. So, I think villages, since that case, are showing more concern toward what's going on in the pension case. It's interesting here because Firefighter Williams had applied for a line-of-duty. Let me go back. Just the legal issue. So, I found it really interesting that the facts play out that the board communicated with the village and asked the village if they wished to intervene. And the village did not respond and then showed up the day of the hearing and said, and now we want a pension plan and the board said, wait a minute. We asked you about this before and you didn't show up and all that kind of thing. And that seemed to be part of this discretion idea that the court is talking about. I also find it interesting that you were the lawyer. I was involved in it, but I wasn't the actual lawyer that was showing up at the proceedings. I was involved with many of the briefs. You were involved where the representative board, someone in your firm, reached out to the village to see if they wanted to intervene. I mean, that tells you that this is happening out there in a lot of these courts. I think the case was real clear that the pension board has the discretion to allow the village to intervene after the Stickney case. I think it's up to them. Can you give me any contours of what you think that range of discretion is? What the court said is that they can't abuse their discretion. They have to look at it carefully what the reasons are for intervention. That shouldn't be abused. Okay, so can you give us some ideas of what you think, what should the board do in terms of exercising its discretion? I think the board should ask the village to explain why they want to intervene, which the board did here. But you have to look at the reasons given by the village. And if it's, we want to ensure a complete record, I don't think that's good enough. Why? Because the board can do that itself. It's supposed to be a non-adversarial process, and the pension board trustees are put in that position to ensure that there's a complete record, to ensure that they have village appointees on the board. Even now the makeup has changed. There's village appointees on the board to ensure that there's a complete record and pensions aren't being doled out freely to anyone that comes before them. The Stickney case... Help me. Where is this line? So you agree that the boards have discretion to, if someone comes forward, the village comes forward and says they have a reason why they need to be there, they need to add something to the record here. That's fine. I think if they can identify what the village can add to the record that would assist the pension board in making its determination and its relevant evidence, I think that would probably not be an abuse of discretion to allow the village in. But where they just come and they give a reason that the pension board can't adjudicate when they say we're worried about health insurance benefits, and if you give them a line of duty disability, we're going to be affected, our budget's going to be affected, we're going to have to pay for him and his family for the rest of his life, the pension board has nothing to do with health insurance benefits. So the financial piece should not factor into this discretionary decision? According to the Stickney case, no. Why does the Stickney case say that? It's in DICTA, the Stickney case, where it says while the court does assign the village to finance the pension fund by levy and taxes, nothing suggests that that duty to levy taxes gives it a right to intervene in pension proceedings. Isn't that where they're trying to figure out where would this authority come from? Right. And they're looking at these other sections of statutes to determine where it's coming from. It's not coming from that. They say it's where it's coming from, it's from the initial review effort. Right. But my point is I think that analysis is instructive on whether or not they're exercising due discretion, and simply levying taxes I don't think would be enough to intervene in a disability application process, unless they can say they're offering some sort of evidence. And they did. They did offer evidence here. They called Dr. Freelander or whatever his name is. That wasn't expressed to the board when they were doing their intervention petition. They simply said we want to make sure this is a complete record and we're concerned about health insurance benefits. It wasn't until after they were allowed to intervene, then they sent, then they did a records review with an expert doctor. But that's okay for them to do that once they're properly in. I think once they're properly in, sure. The problem is the fact that I think the only thing they gave that they were going to offer the board was we're concerned about health insurance benefit payments. And that, I think, unfairly infected the board. Did you say that you did not agree that this was an adversarial proceeding? No, I think it was an extremely adversarial proceeding. I thought I heard you say that. I thought I heard you say that. You heard that, I guess. That's the words right out of my mouth. I think what I meant to say was it's supposed to be a non-adversarial proceeding, but once the village was allowed to intervene, this became an adversarial proceeding. Well, let me ask you this. How can it be a non-adversarial? You say it's supposed to be non-adversarial? That's correct. Well, you know, I mean, what are we doing here? I don't understand how it cannot be adversarial. They have this side and they have that side. In normal circumstances, Your Honor, an applicant comes before the pension board and says, here's my injury, here's all the evidence I have, you know, you can question me. If it comes to an attorney, the attorney will question him. He presents the evidence, they do a fact-finding, and they decide whether or not he's met his burden to show that he has sustained a duty-related disability. In this case, it turned into the village versus the applicant, and the village on one side arguing to other village members on the board, and that brings me to my other legal issue. Okay. Don't go on again. I have a stickney, which you don't really talk about. Stickney says yes, there's discretion, it should be used for care, and then goes on to say that even if there is an abuse of discretion that does not necessarily result in a reversal, it goes on to talk about this in the language of the Administrative Review Act about technical errors. Okay. So maybe here the village didn't give a well-defined enough reason to inform the board how to make a decision, and in doing so, the board loses discretion. So now you have to show us something else. Right. At least according to the stickney case, you have to show why does that have any meaning? Why should we reverse it? And I think Firefighter Williams did that. You're right. The second part of stickney says it's technical error. Unless the plaintiff can show that there's prejudice, it's by this error. And I think Firefighter Williams was able to show prejudice here because the fact that the village came in and argued to the village attorney, the mayor, the village treasurer that, you know, your decision here, keep an eye towards the village agency. That's not always going to happen. And that's the catch 22 we have here. The way these boards are legislatively constructed, there's always going to be this tension between the appointees now, let's say, of the village or the specific individuals, the appointees of the firefighters. I mean, isn't there always going to be that kind of tension? I don't think so, Judge, because I think it's up to the board to regulate how their hearings are conducted. And that's what the stickney case talks about. If the pension board here would have said, okay, village, we're going to allow you to intervene, but anything dealing with that health insurance that you talked about, I'm instructing the board members to disregard anything about health insurance. We can't decide health insurance. If you have relevant evidence regarding Firefighter Williams' disability, we're going to allow you to present that.  They called the doctor. But the board didn't put anything up. That had nothing to do with health insurance. They had evidence about this event. What is the expert testimony about this event? That's what they did. They introduced evidence. They didn't say it was a very focused kind of thing. The village did that after they were basically given free reign by the pension board to do whatever they wanted as a party to these proceedings. My point was, in addressing Your Honor's question, is I think that you could eliminate the adversarial as much as it was here in these cases by the pension board setting some ground rules. I think the stickney case touches upon that, that the board has the discretion not only to allow the village in as a party, but to set the ground rules and decide how much are they going to be allowed to participate. Do you agree, Your Honor, that there is discretion to allow them to intervene and exactly where that line of discretion is still kind of muddy out there? I agree with that. And then secondly, we have to look at this technical error kind of idea. And you agree that if there's intervention, and apparently we're moving towards a way where we're going to see a lot of this happening in the future. The legislature can set this up, but there's always going to be this tension between the intervenor and, or not tension, it's going to be an alignment between the intervenor and some of the members of the board. That's always going to happen, right? It may, Judge. That's a very difficult question to ask because I don't think you can say an always or a never. I think if the board sets appropriate guidelines to intervention, and the board's attorney here said that during the hearing is, you know, in the future, we should have some guidelines for if the village intervenes as to how we're going to handle that. So really what you're concerned about is not a big general rule. You're concerned about what happens here after the board exercises discretion in allowing intervention and all of the village members of the board said we're fair and impartial, don't worry about it. You're concerned about this hearing and how this specific hearing was conducted. Is that really what we're talking about? Yes. I mean, I don't think you're going to run into this problem in the future because the legislature changed the makeup of the board. You're not going to see the mayor, the village attorney, and the village treasurer on the board. You're going to see village appointees which may or may not have any connection to the village. It could be the village attorney, right? It could. This scenario could happen over and over and over again. So I think it will change. Are you suggesting that if the village exercises its discretion and allows the village, the board exercises its discretion and allows the village to move, then there's some obligation on the board to limit what the village can and cannot do? No. That's not what I'm saying. I don't think there's necessarily a limit depending on what the village says the reason they're coming in for is. If it's a situation where the officer is not fit for duty and the chief sent them to a fit for duty evaluation, a psychological type injury, and he says he's not fit for duty, the fire department in the village has a report saying he's not fit for duty or he is fit for duty and the pension board is saying we've got to define whether or not he is fit for duty and the village comes in and says we have this report. We'd like to intervene as a party. We'd like to have as much discretion to do whatever we want here. We have this evidence. Here's what we're intending on doing. We're going to call this witness. We're going to give this evidence. I think that would be okay. I'm not seeing that big distinction between what you just described and what happened here. The board basically allowed the village to intervene, albeit for reasons that you claim were weak or inappropriate. But once they're in, they're in. And I think a few minutes ago you agreed with me that once they're in, they were allowed to call Dr. Friedberg and have him give his opinion as to the cause, whether there was any causation related to the on-duty injury and the plaintiff's current disability and all of that. And the board's discretion allowed them to accept Dr. Friedberg and Dr. Samo's opinions over the opinion of Dr. Flamberg, who is the treating physician. I don't understand how this is different from the scores of other similar cases. We haven't talked about it here, but you are very pointed about the village attorney being so intimately involved and, in fact, wearing two hats in the case. And isn't it true that she made some attempts to erect an ethical wall in this case by referring the case to an outside attorney? I think she tried to do that. I don't think it was successful, Your Honor, in the way it went down. Well, as a pension board trustee, she was giving what was going to be evidence to introduce at the pension hearing, presumably a conversation with the other village attorney. This is before the board allowed the village to intervene. Correct, but there was a pending application. Is this a part of your complaint, a part of your issue, that they should not have been allowed to intervene in the first place because this attorney was conducting ex parte communications with other people? I don't think that went so much to the intervention as I do what went to the fairness and impartialness of the hearing. I think they could have still allowed the village to intervene, but then that village attorney should have refused herself. She had already formed an opinion regarding that evidence in order to provide it to another lawyer. How do you know that? In fact, she voted against the plaintiff, I think, as a clue, that she didn't agree with it when it was all done. But didn't all of these people take an oath that they have to listen to the evidence just the way any prior fact would do and then based on the evidence that they find most credible make the decision? They did, Judge. I think if it wasn't the village attorney or, as the Ward case says, someone involved with financial decisions of the village, that might be okay. But here, an attorney, she has taken an oath to zealously and loyally represent her client, who is the village. And then the village now becomes a part of these proceedings and advocates to that same... Isn't that all that's going to happen now? I understand the attorney and the advocate's obligation to the attorney, but the statute at the time set this up. The village attorney handed down the vote. So just because it's at the top of the bin, we're going to take it. Judge, I don't believe that this scenario ever happened prior to this case. Maybe it did and no one objected to it, the attorney for the advocate didn't say anything, but I don't think there was a scenario where the village intervened and then made arguments to the village attorney. As a trustee, I don't think that ever happened because villages weren't intervening up until that Crowley decision. This is something that happened after the Crowley decision came down. I mean, it is possible. Maybe it didn't and I'm just not aware of it, but I don't think that scenario happened before. I don't think it will happen in the future, although it is certainly possible a village attorney may be appointed by the mayor to sit on these funds in the future. I think that's why this case is important that Your Honor take a look at it and give some precedent or some guidance to the boards to say, if you're a village attorney and the village intervenes and argues in front of you, I think it's prudent for you to step down and not adjudicate the evidence. This was a case where there was eight people deciding this matter. The case would have went forward without the village attorney sitting on the board and cross-examining every witness and then objecting to questions that I would raise. I have a question that I would like to ask you. The village attorney, she participated in the proceeding as a board member, but she raised objections during the proceedings as well. Which I have never seen happen, Your Honor. A board member who's supposed to be sitting as a trier of fact, basically as the judge and jury in this case, more of the jury as a trier of fact is raising objections to my question and then making a motion to bar evidence that I was seeking to introduce. I mean, if that doesn't show that there was either a conflict and or bias here, I don't know what does. I've never seen that happen. It's highly unusual for the trier of fact to make objections. Mr. Rochester, try to bring your remarks to a close, please. Okay. I've gone over, there's three issues that I've asked this court to decide. One is that this case is against the manifest way to the evidence. I think if you look at all the doctor's opinions that were presented in this case, that you should be left with no doubt that the injury sustained in September of 2003 was a contributing factor to Firefighter Williams being rendered disabled. It was a contributing factor to both his surgeries, and that's what caused him to be disabled. I think if you look closely at the reasons the board and the village gave for why they relied upon Dr. Friedberg and Dr. Samo, you should arrive at the opinion that this was against the manifest way to rely on those doctors as opposed to others. And I ask that you reverse the findings of the board based on the manifest way standard. In addition, I ask that you find it was error as a matter of law, and that the board had affected Firefighter Williams' due process rights by allowing the village to intervene and at the same time allowing members of the village, especially the village attorney, to sit as the trier of fact in this matter. And I ask that you reverse on that basis as well. You just said there's three issues. You're saying that you put the two together. The due process violations, and how did you articulate that? Once the intervention was granted? I think at that point it affected the due process rights of Firefighter Williams. And, you know, I think the questions that Justice has raised to me. I think we can listen to the tape. I think it was something that you said after the intervention, that they granted an intervention while allowing the village attorney. The village attorney, the village treasurer, and the mayor to remain as decision makers in the trier of facts on this case, that that was in violation of Firefighter Williams' due process rights. And if I can very quickly, I'm going to close, Hunker. I think you have to look almost at the intervention and the ex-official members on the board together when you're deciding whether or not a due process violation occurred here. Because to me it's really the totality of the circumstances here. They may have had the ability to intervene, but once they did, I think there was an obligation on those members of the board to recuse themselves because of the conflict or the bias. And I think the attorney demonstrated that during the hearing. The attorney's conduct during the hearing seems particularly bothersome to you in your brief. You didn't talk about that much, but is that a big issue for you? It was, Your Honor, and I'll be happy to try to address it on the court. I just ask that you spend some time on it. It was bothersome because it felt like, just being in the atmosphere, it felt like we were up against a stack deck. And I think that needs to be eliminated when this situation occurs where the village intervenes. As Justice brought up, maybe that will always happen, but I don't think it will if the board takes due care and takes a look at the interests of the people on the board. And if there is a village attorney who's taken an oath of loyalty to the village, maybe they shouldn't participate in that decision in the future. For those reasons, I ask that you reverse the decision of the Pledge of Allegiance. Thank you. Thank you. Good morning again. I am the attorney for the Morton Grove Firefighters Pension Fund, Carolyn Clifford, and I did represent the board in this disability matter and serve as a hearing officer during the 10 days of hearing. I appreciate this opportunity to present this to you today, and I thank you for having read the luminous record. It is clear that you did do so, and I thank you for that. Because there are two parties that are interested in the same side of this matter, the attorney for the village, Jalika, and I will divide the argument into two issues. I will address the manifest way of the evidence issue, and Ms. Leek is going to address the issues on the due process and the intervention issue that Mr. Rogers has raised. I don't think I need to spend a lot of time explaining the manifest way of the evidence issue because clearly from your questions already today, you understand that implicitly. It is a very high standard to surmount, as the Marconi case noted. And with that, I think that even where there were conflicts in this interest in the evidence that was presented to this board, they had the duty and the obligation to resolve those problems and come to some conclusion as to was this related to his job. I think from your questions that you had of Mr. Rogers, it was clear right from the inception that you knew that there was a lot of credibility problems involving this firefighter, and it started with the injury that he reported in September. You identified quite a few of the problems. It started with not knowing what day the injury occurred. It was further conflicting by the circumstances of the exact ambulance call that he was on. He was fixing facts from multiple calls that day, and he certainly wasn't- Ms. Clifford, let me reiterate. That was the board's finding. The board said in their finding that the cause of the plaintiff's disability was his failure to participate in the therapies that were- they listed several things, but the therapies that were prescribed for him following the second surgery. Does that beg the question of why the plaintiff needed the surgery in the first place? Was there any other evidence in this case other than the September 26th and 27th injury that the plaintiff reported? Was there any other evidence of the plaintiff having suffered any other injuries? And that is why this was a difficult case to resolve, because the injury that he did report did not align with ultimately the type of injury that was discovered once he had the surgery. That's what you say. That's not what they say. They have medical testimony that says something else. Dr. Slamberg didn't say that. But I think the- It was the treater. Well, and that's true. And the treater, understandably, is always going to be an advocate for his client, but I think even Dr. Slamberg could agree. But wait a minute, Ms. Clifford. He's the only one that actually saw the injury. He performed the surgery, so he is the- And it wasn't until the actual arthroscopic surgery was performed that it was discovered. So Dr. Slamberg would be in a unique position to be the one to see that. You know, some of Dr. Samo testified they didn't really look at some of the early records from Dr. Slamberg. So I guess my question to you is, is there any other evidence in this case of another injury that this plaintiff suffered other than the- Whether you believe him or you don't believe him or you like him or you don't, is there any other evidence of any other injury that this plaintiff suffered other than that? There isn't. And that's because the only evidence or the only injury that's reported to us on duty for us to scrutinize is the September injury. And because of the issues surrounding his credibility and how we reported that and whether it actually was an injury, coupled with the fact that it resolved and seemed to be more of an acute situation, it seemed, if anything, to be more of a- But can we agree that he did suffer an injury, that there was an objective finding of an injury having been suffered in September of 2003, whether it was, you know, the degree of injury we want to talk about. But can you agree that there was an injury? There was an injury. What we are unsure about is whether it actually occurred on duty and the degree of it seemed to be acute and resolved. Just remembering causation in these disability matters, to be a cause of an ultimate disability, it needs to be more than just making symptoms worse temporarily. And that seems to be exactly what happened in this situation. So how does that play out with respect to his workers' comp claim? You know, workers' comp is kind of a different animal in that the village and the workers' comp area have a lot of flexibility to make kind of a cost-benefit analysis. I understand. But doesn't that require that that must arise out of and be in the course of your employment as well? That's true. That's like the threshold. You have to meet those two. That's true. And I think workers' comp missed it this time. And I think it's because they didn't have purview to a lot of the information that ultimately came into our process, not only the testimony from Dr. Freeburg, who was able to really talk about what mechanisms really would cause a slap tear, and discount that what would have happened on that ambulance call could not have risen to the level of being a cause. Ultimately, we're never probably going to know exactly what caused the injury, that slap tear, that required to be repaired. But what we were able to eliminate is an ambulance call that may or may not have contributed to the soreness and the sprain that he suffered in September did not rise to a cause. It may have made symptoms of that shoulder temporarily problematic for him, but they resolved, which is evidenced by the fact that he returned to work for five-and-a-half months without incident and engaged in actually quite a bite. Well, which way does that cut? I mean, they argue that he was a conscientious firefighter, had been on the job for 15 years, and was known to be conscientious, hadn't had any history of problems, and argue that that signifies his eagerness to try and get past this injury and continue to do his job. I don't think there was any question that he was a good firefighter and that he worked hard and he did his job to the fullest. I think, though, he had credibility issues as to having a motivation to have something on the job be a cause when there was evidence to suggest there were other causes. That's my question. Is there anything else other than speculation? Do you have anything else that this man injures himself anywhere else other than on the job? I think the other big piece was the weightlifting incident in the summer in his own basement. But that would have been an aggravation of the injury that occurred in December. Remember my question. My question is very narrow and very specific. Is there any other evidence or information or anything in this record that speaks to this plaintiff injuring himself anywhere else other than the September 26th or 27th injury that started the ball rolling? I think everybody agrees that prior to this time there had been no talk about problems with the shoulder, no history of anything. Right. And I'm not so sure that that necessarily means there wasn't problems with his shoulder that was dysfunctional. Well, I'm just asking about what's in the record. No. And you're absolutely right. There's no other evidence other than we knew he was a weightlifter and he was not forthcoming with the board as to the weightlifting issues. And that's when we get into his attendance at the OLLI Health Club, the fact that he had weights in his basement, and that he wasn't forthcoming at first with where that weightlifting incident occurred in the summer between the first and second surgery. Because at first it was, this is why I didn't do physical therapy. And then he later admitted that, well, I was doing it myself in my basement. So back to my original question, though. You know, doesn't the board's finding that the cause of the disability was a failure to participate in whatever therapies were prescribed for him to get his shoulder back to a normal range of functioning, doesn't it beg the question as to what caused the shoulder to need all the surgery and all of that in the first place? Right. And remember, the burden is not on the board to determine what caused it. All our burden is is to look at whether they've met their burden, that the on-duty incident was a cause of the injury. We can conclude that it's not after we resolved all the conflicts and looked at the big picture of all the evidence. But it's not our job to figure out exactly what caused it. And I think that's where there's a confusion on the plaintiff's side, that they want to make us prove something that is just beyond our abilities in the kinds of experiments you're hearing. I need to reserve some time for my colleague, so I think I'll step aside and let her address the other issues.  As I noted earlier, my name is Jill Leka, and I represent the village of Morton Grove in this matter. And I do intend to address the two remaining issues, and that being the intervention and the due process claims. Turning right to the intervention issue, I was actually glad to... Why did you turn right today? Has the village ever intervened in one of these hearings before? My recollection for this particular village is there may have been one other matter in which the village had intervened. And I believe that there may have been one other subsequent to this one. I believe there had been. Yes or no? Your Honor, I apologize, but I only represent the village in certain matters, and I had only recently begun representing them prior to this time, so I cannot answer that concisely. Would you say that this intervention was unusual? I would say that this intervention was based upon the particular facts of the case, and that it would not be the norm that the village would intervene in each and every pension board case. Well, it's a yes or no question. Was this intervention unusual? Yes. And what was the basis that the village decided to intervene in this case? Okay. The basis of the village deciding to intervene in this case was the fact that there were a lot of questions. There were a lot of medical opinions. There was a lot of confusing information. This individual had claimed an injury early on and had had multiple surgeries and had never returned to work from the first surgery. Maybe that's true. So all these facts are out there. So why, thinking about intervention, certainly the hearing officer can bring all that up. We've heard that she has a great mastery of all these facts. So why was it necessary to have an intervention? Well, let me just back up and address a couple of points in response to that question. First of all, we understood that the village being allowed to intervene was discretionary and that in order to intervene, we needed, one, an interest in the intervention, and we also needed to show what we would bring to the table, so to speak, what we could add to the hearing. And the interest of the village here were the fact that there was a claim for a duty-related pension, thereby potentially increasing the village's cost for pensions. And secondly, it appeared based upon the fact that there likely would be a claim for the PSCBA benefits, okay, which Mr. Weiss had just pointed to. And while the pension board- What does that mean? I'm sorry. The Public Safety Employee Benefits Act benefits. In other words, he would be, as your opponent said, he and his whole family would be entitled to health care- Correct. For the rest of their lives. Correct, Your Honor. And according- But what if the village might get to have more money? That's their interest? The village had a financial interest in intervening here. That's why it- So that would be true in everything? Not necessarily. I mean, not the extent of the financial interest that the village would have here. And again, as I noted, there were also some questions about- To me, you're saying the village has to show its interest, and if interest is the village is going to have- if it's a really serious firefighter, the village will have to pay out more money. Correct. But that village- Don't we make the village always a party in one of these? No. Why? Because the village interest in certain cases is greater than in other cases. For example- Financially. Financially, greater, yes. And certainly, when the Public Safety Employee Benefits Act benefits come into play, we're talking about potentially a cost of a million dollars to the village, as opposed to a lesser cost if it's a non-duty related pension. So here we had a claim for a duty related pension. We had what was likely a situation that was going to evolve into a claim for Public Safety Employee Benefits Act health insurance benefits. And you had some questions created about the entitlement in this case. So those three factors caused me to evaluate the case- I still think that what you're telling us is in every single one of these cases, because the village may have to pay off this kind of benefit. The village has a right to be at the table. No, I'm not suggesting that. We have never claimed that the village has the right to intervene, only that it's discretionary on the part of the- Every time you say, here's our reason, we're going to be on the hook for a million dollars, and that is enough in every single case. But we haven't done that, Your Honor, and it hasn't happened throughout. It hasn't happened throughout the state of Illinois. It has happened in certain isolated cases. It's happening more and more, as we noted, because the financial stakes are increasing, the village's finances are shrinking, and because we have more and more people claiming benefits, and that's more and more questions created about the entitlement. So that was the village's interest in this particular case. Because this is a claimed duty-related disability where he's been entitled to 65% of his salary and the PSEDA benefits, which catapults this into a whole different financial range, the village's sole reason for intervening is so that they can advocate against the plaintiff getting benefits? No. Is that where we're going? No. At the time of the intervention, the village had not decided what position it was going to take. It did not have all of the information. And present evidence on behalf of the firefighters? We weren't sure at that point. We had some evidence that we were going to present. We did not know what position we were going to take. A review of the record on the oral argument would show that we did not take a position as to whether we were going to say he was claiming he was disabled, not disabled, whether it was duty-related, whether it was not duty-related. Our interest was in making sure that the pension board had all the information that was out there. We knew we had information that they didn't have. We thought that additional information was needed in order to clarify the situation. And what was the information that you had that the pension board had? Actually, please note that the village submitted a petition to intervene. We also filed a response to the objection, and we engaged in extensive oral argument. And during that, in those documents and at the oral argument, we identified a number of things that we would bring to the table, so to speak. We indicated that we would like to call Dr. Samo as a witness to explain his reasons and why his opinion differed from the others to see if there's- The pension board could have done that? But they hadn't planned on doing it. There was no indication that they had planned on doing it. We didn't know if they were going to do it. We also indicated that we wanted the right to cross-examine Mr. Williams. We noted that there were some records in the record that were illegible that should be clarified. We noted that there was likely a necessary transcription of some records. We also noted that there were other attendance records and other records related to his medical condition that would be relevant to the proceeding. Those were just some of the- Were you neutral? Did you have some documents that were going to be helpful maybe to the firefighters? Because you were being so neutral about this? What documents, for example, you just said there were some documents, but it was the attendance, et cetera, right? I'm sorry. What was the last one you described? The attendance records. Yeah. So you wanted to introduce that, is that right? Yes. And that was going to be- Why did you- What was the relevance of that? Your Honor, I apologize, but I don't recall specifically exactly what those attendance records were going to go to. It was the firefighter, I predict. Go ahead. Our interest, again, was in having a complete record. Were there some questions in our mind about whether or not Firefighter Williams was entitled to a duty-related disability pension? Certainly. There's no question about that. But there sometimes are, you know, that does occur. But once you gather all the evidence, sometimes you make a decision that that is not the case. So at that point, there were questions. The village had an interest. That's why it moved to intervene in an effort to supplement the record. And throughout the process, the village did, in fact, ask to do that. It was allowed- Okay. The village has been the case. We've gotten to that. Let me ask you about the village attorney, Ms. Liston. Ms. Liston? Didn't she actively represent the village in the administrative hearing and then vote on the case? She did not actively represent the village. Were there any objections to testimony, advocacy? Well, I think that when you were sitting as a prior fact, as a hearing officer, as a decision-maker, that you had the opportunity to ask questions. Asking questions is okay, but she was objecting. She was making an objection along with the other attorneys. It was as though there were two attorneys representing the village, the one that was sitting as a board member and the one that was actually representing the village. So my question to you is, in making objections to opposing counsel's line of questioning, is that considered advocacy? I don't agree that it is, and I don't see any difference in making a- Well, just take my word for it that in the transcript there is an indication that the village attorney made not one and at least two objections to certain questions that were brought out, and you don't consider that to be advocacy? I do not agree that she was acting as an attorney representing the village in this matter. My question is very narrow, Ms. Liston. I'm asking you whether in the course of a proceeding, when an attorney is examining a witness, if another attorney who is participating in the proceeding make an objection, is that advocacy? That's all I'm asking. It's a narrow question. I don't agree that it's advocacy on behalf of the village. It may be advocacy on behalf of the pension board, which was the hat that she was wearing, which is why she had the foresight to recommend that the village perhaps consider outside counsel. Pardon? Didn't the pension board have somebody? They had their hearing officers there. Yes, they did have their hearing officer there. Okay. So it's not- and then she switched hats and she votes on the same issue, and you don't think that's a conflict of interest? On that particular issue or on the big issue? Either one. Okay. I don't recall specifically what the objection was that she made or how she ended up- No, that's what I said. On January 6, 2005, did you have any reason to doubt in his statement that he wouldn't be able to do anything with his arm? Liston, objection. Okay. She's objecting to his question. Okay. Is that her role? Well, I think that- That sounds like a lawyer. It doesn't sound like a decision-maker. Well, she- Ms. Dixon is an attorney. I mean, you know, we don't walk out of this courtroom and take off our attorney hats. That doesn't mean that she was representing the village as she was sitting there still being an attorney. Ms. Dixon, you know we were standing here before us. That's why we're asking you to resolve these questions for us. Certainly. We have to write an opinion, and the opinion has to be coherent. And so that's why we're asking you these questions. These are not trick questions. My question was just, you know, what constitutes advocacy? That's what I was trying to get at. It doesn't sound like advocacy to you. That's your- I would say that it is probably unusual for a trier of fact to sit and make an objection. I also know that in all parts of my life, for example, it's hard for me to take my attorney hat off, whether I- even though I may not- This is just a misstatement on her part. Correct. I mean, it's something that just comes. It doesn't mean that she was advocating for the village. You know, you're right. If I said stupid things to the bench, forgetting where I'm sitting, probably, in my 26 years, probably. You make mistakes sometimes. I was interested in how, in the earlier discussion, you were talking about intervention, and how you had looked at the evidence that was going to be presented by the hearing and decided that there were additional evidence that you wanted to present. Correct. And that's the basis of intervention. How did you know what evidence was going to be presented? Well, I had copies of the documents. What did you get? They came from the village. From whom? I believe that they came from the village attorney. Who is this again? Terry. Yes. So, listen, before the hearing- This is not a misstatement. Before the hearing, long before the hearing happened, while this is all getting put together and developed, decides that she's going to take the evidence that is going to be handed to her as a decision maker and give it to you. Is that right? She gave me whether the documents were going to actually be presented as evidence was still up in the air because it would be subject to objections of Mr. Raja, would be subject to decision making of the board about whether they thought it was relevant, etc. Doesn't it sound like she's taking a side that she wants to, in some way, not be the neutral decision maker. In fact, she wants- Part of the problem, and I'm going to be honest with you. I want to give you an opportunity to explain this. We're judges, and I think we are appalled at the idea of this kind of ex-community party communication. I'm the judge. I have the evidence. I'm going to give it to one side. Ooh, that makes me very uncomfortable. The other side already has the evidence, Your Honor, or the documents. Excuse me. I believe part of my problem, and this is where I want to give you an opportunity to discuss this, is that this is not the same as this one. It would not be the same idea as me as a trial judge giving evidence to someone. Correct. So I want you to help me because right now it feels real uncomfortable for me to see a decision maker saying, okay, these folks have the evidence. I'm going to give it to a third party to see if they can make this case. Well, you're right. You're telling us that you haven't decided who you're going to argue in favor of, but pretty clearly you're going to come in and try to deceive the client. So here is a decision making saying, here, can you come in and make this case worse against the police for the firefighters? But that's not what the facts show, Your Honor. I mean, the facts are such that Ms. Liston has these documents. These documents flowed from the village in the first place. So the village had the documents separate and apart. It just didn't have them compiled in the same fashion. Ms. Liston looked at it. Granted, because of facts separate and apart from necessarily what was in those documents, but likely from what was in those documents, said maybe somebody should look at this to determine whether the village should intervene. She did not suggest intervening. She did not direct the village to intervene. She was not involved in the determination to intervene. She didn't even give the documents directly to me. She ended up giving them to someone else to give to me. We had no discussions about it. My task was to review the documents and make a determination whether or not the village should intervene, and if so, what position to take. We erected a Chinese wall. All of my communications were with the village manager, not with the village attorney. She was in no way acting as a village attorney in this regard. This is really no different than in a case of conflicts, which also often arise in a situation involving municipal law departments, where if you as the city attorney have a conflict, you hire outside counsel. You may continue to represent one of the defendants, but you hire outside counsel to remove the conflict in representing that other person, and that's what she did here. Have you ever seen this where a decision-maker is in that role? The decision-maker is communicating with an attorney for what eventually became a party. I think that it happens frequently in the case of municipal law where you have, for example, disciplinary processes, and you have the hearing officer hearing the disciplinary matter, and then you have another attorney working for the city that's representing the city as an advocate in the same proceeding, and there may be discussions in advance before the proceeding even begins about what the evidence is going to be, what the cases are going to be. The same, the decision-maker and the counsel? Yes. Yes. You know, the same rules of judicial conduct that apply to all of you with all due respect do not apply to these situations. And, for example, you are absolutely important, because to me this just shocks me. But, again, I'm thinking about it as a judge, and I understand. This is not a trial. An argument is made here that this is a due process violation. So let's try to couch our discussion in terms of due process. In terms of the right to have a fair hearing. Correct. And I'm a little concerned about where that arises from. I think it arises maybe from statute. So you're telling me that it is not a violation of the right to have a fair hearing where a decision-maker has conversations and shares documents with one of the adversaries? Well, there weren't really conversations, Your Honor. And the documents were shared that were not yet evident in the proceeding. You just told me this happens all the time. And the proceeding had not yet begun. People have conversations all the time. Decision-makers and village attorneys talk to each other about the case ahead of time all the time. In disciplinary matters, it does frequently happen. What's your evidence going to be? What's this going to happen? Yes. And that doesn't have any due process implications to you? Well, due process under the Constitution, due violation of the procedures. I mean, and I think we have to go back to, you know, what happened here, because I think that we are, you know, with all due respect, maybe a little far afield. Well, I think it's far afield. Okay. I'm very concerned about this, in case I haven't communicated it. I understand. I want you to hear what I'm saying to you. I am very worried about decision-makers and lawyers or adversaries chatting before the hearing and coming to decisions about what the board is going to decide before they even hear the evidence. Well, but that was not the case. That was not the case. There was never any discussion about what the decision-maker was going to decide or what position the village should take. Nor is there any evidence in the record to that effect. The evidence in the record shows that she participated. She was an active participant in the hearing. There's no question about that. But certainly the other board members were as well. They asked questions. They asked to have witnesses called. They moved for deadlines. And these included the firefighter representatives as well as the other attorneys. The mere fact that this individual happened to be an attorney does not change the fact that she sat on the same playing field as those other individuals in this case. She was not acting as an attorney. She was not wearing her attorney hat. I mean, you don't technically take it off, but she was not wearing her village attorney hat. I mean, I sit on a liquor commission, okay, but I don't have to be an attorney to sit on that. We act as a tier of that. I do. I talk with the attorneys for the city who are prosecuting the case in advance about they tell me what the complaint says and how many witnesses they're going to have. And, yes, and they do tender the evidence to us ahead of time. I still can't get past the fact that you don't think that making objections to a witness's testimony in the course of a hearing is not advocacy. That's what you said. You don't think that's advocacy. Your Honor, and maybe I should clarify, I don't think that's advocacy on behalf of the village. I think that is, well, the pension board. The pension board was well represented. They didn't need the village attorney to act on their behalf. Well. Who was it on behalf of if not the village? Well, Your Honor, I mean, I think that I was adequately representing the village's interest, and so I don't think that I really needed any assistance in that regard. So I believe that she was acting on behalf of the pension board. And so perhaps it could be considered advocacy, but I do not believe it was on behalf of the village. But is it appropriate for an advocate to then be one of the decision makers? Well, an advocate for the pension board? I mean, when we were in the course of the hearing, I had pension board members. An advocate for anybody other than the plaintiff. Is it appropriate for an advocate for any of the defendants or respondents to then be a decision maker on the ultimate issue in the case? That's my question. I don't believe that Ms. Lipson was anything but an advocate in her role as a pension board member. I do not believe that she was advocating for the village. Bring your remarks to a closed counsel. Your Honor, I was glad to hear that Mr. Raja finally agreed that the board had the discretion to allow the village to intervene. We believe that the pension board appropriately exercised that discretion because the village identified both an interest in the intervention as well as what it could bring to the table. Moreover, particularly with regard to the intervention itself, Mr. Williams has not shown how he was prejudiced by allowing a full and complete hearing. Turning to the due process argument, Your Honor, Mr. Raja argues that this due process violation arose only because the village intervened and because individuals couldn't wear two hats and because of the exclusive purpose rule. The exclusive purpose rule doesn't protect just Mr. Williams. It protects all the beneficiaries to the fund, and it protects them by the pension board ensuring that it has adequate resources and by screening out claims that aren't valid. In terms of this dual responsibility, I mean, all the members of these boards have dual responsibilities and wear dual hats regardless of whether or not the village is an intervener or not. I mean, and that's true not only of the village representatives but also the firefighter representatives. I mean, eight of the nine individuals are employees of the city. And Mr. Raja hasn't explained why, for example, it was a conflict for the village clerk, which the Coincase specifically said it wasn't, but why it would not be a conflict, for example, for the fire chief, who had also responsibilities over finances and knew about the case. So, again, the cases say that there's no per se conflict. All of these individuals took oaths of office saying that they could be fair and impartial. So Mr. Raja has to show something more than just this dual employment. With regard to the city or the village attorney, he does single her out. And when you look at it, yes, she was an active participant in the hearing, not disinterested, as Mr. Raja said. But the others weren't either. The role that the village attorney played consisted of, one, sharing some documents in advance of the hearing, documents that weren't yet exhibited, and documents over which there was no rule prohibiting being disclosed, and, two, making an objection or two at the hearing, in my view, on behalf of the pension board. And under those circumstances, I don't think that the record shows that Ms. Liston showed that she couldn't credibly and independently and fairly judge the evidence. Nor is there any indication that the result would have been different had she not been present because the vote was five to three. Thank you, Your Honors. Thank you. Brief response, Mr. Raja. Thank you, Your Honors. I just want to address the due process issue. I think Your Honors have to look at this as the totality of the circumstances here. It's interesting. This was part of the record. There was no dispute over Firefighter Williams' workers' comp benefits. He was paid for all his medical bills, paid while he was off. The fire department actually considered his leave duty. Well, I don't think that's fair. I don't think you should even talk about the working staff. They're not here. That's not before us. And, you know, who knows? That case was settled, wasn't it, Matt? It was, Judge. It was settled. Hey. My point is the village was a party to that. Presumably, Ms. Liston was a party to those workers' comp proceedings. They also paid PETA benefits, the Public Employee Disability Act, which a village doesn't pay unless it's a duty-related injury. Presumably, Ms. Liston was a part of that proceeding. Also, the fact that Ms. Liston also, not only was she making objections to my question, she actually made a motion to bar evidence that I was seeking to introduce. That evidence was an EEOC complaint that Firefighter Williams had filed against the village. Presumably, Ms. Liston was involved with that as well as the village attorney. So she certainly was an advocate on behalf of the village in this case. The EEOC complaint coming in would have no effect on the pension board whatsoever. And it would harm the village. What rule do you want us to write? What's the big idea here? It's going to affect our decision. That's my concern. Okay. So you want to say, first of all, I think we kind of got you to say that you agree with Stickney that there is the discretion to allow intervention by the village. And maybe it can be as broad as we have a significant financial interest in this. And maybe we have got you to agree that in and of itself, I'm not sure if you agree with this, but in and of itself, the intervention does not, per se, create a conflict with board members who clearly work for the village anyway, and we already know that. All right. So now it sounds like we're down to the village attorney. So the question is, what kind of rule are you asking for? The village attorney can never sit if there's intervention, or Ms. Liston here went beyond what her role should have been. What kind of rule are you asking for? It's an excellent question. I think it's probably a combination of a number of those things you mentioned. I think the board has to exercise due care, as I think the Stickney case already says, in intervention. And if there is an interested party that can't, I want to cite the language that's used in the cases I cited to talk about conflict. If there's some tie to a person that would benefit from the verdict on that board, they should be treated. She doesn't benefit. She's like everybody else. She works for the city. Her paycheck is not going to change. I don't see those kind of cases. I think the rule would have to be due care has to be exercised, and they have to ensure that there will still remain a fair and impartial hearing by the members on the board when the village is now a party to those proceedings. By fair and impartial, there should not be advocates of the village who have taken a sworn oath to the village to be an advocate that remain as decision makers on the phone. There should never be a village attorney. Well, I don't know that I would do that for Auditor Rush. I may have said that. I may have said that. I think I did say that. That's why you're one of the roles of difficulty. One of the things we like to say is we have to write the case. We have to come up and put this in a nice, pretty little paragraph. This entire discussion is going to have to be sitting there online and in books for a long time. So we've got to boil this down to something really tight. I think part of that due care is the pension board has to get an explanation from the village as to the reasons for intervening and why their intervention would not cause a due process violation for the applicant to that proceedings. I don't think that's difficult to do. As the Council mentioned in this case, there was briefs that were submitted. There was extensive argument before the board. I think the pension board can hash that out when there's an intervention petition that's presented to the board and determine before the proceedings start where the interests lie and whether or not there would be a potential due process violation. As to coming up with a general rule, I wish I had given that more thought prior to today. It's difficult to do, but I think you have to ensure it's exercised with due care and that there's going to be a fair and impartial proceeding after the petition is granted when they do exercise their discretion. I already mentioned that Ms. Liston, I think, was the most egregious person here as far as being an advocate for the village. Really, the problem with the due process here is I think this was about money. It was not about seeing that there was a fair and impartial determination of Firefighter Williams' disability. It was about saving the village from having to pay health insurance benefits for Firefighter Williams. That was made clear from the onset and in the briefs, and that infected the entire proceedings from going forward because you had the treasurer on the board, you had the mayor on the board, you had the village attorney. I understand they're supposed to wear two different hats and be fair and impartial, but when you have the village attorney advocating that this is going to cost you millions of dollars if you give a line of due disability, it was an end-runaround around PCEVA. There was nothing restricting the village from conducting their own hearing if and when Firefighter Williams applied for PCEVA benefits with the village. They could have made that determination as to whether or not the individual was catastrophically injured, whether it arose out of one of the four ways that is cited in that statute. There was nothing preventing the village from conducting its own hearing. It would not have been res judicata because the village wouldn't have been a party to the pension proceedings. So that certainly could have been done here, but it wasn't. It was an end-runaround to prevent, probably to save the village money from having to do another separate hearing on that issue. So I clearly think there was a due process violation on behalf of Firefighter Williams. If I could briefly, I want to talk about the manifest weight. I'm sorry, I'll be very quick. You brought up a good point that I just want to address. I don't think any of the pension board doctors, including Dr. Samor and Dr. Freeberg, were able to point to any evidence to demonstrate that Firefighter Williams wasn't hurt anywhere other than work. I think you've touched upon that. That was clear. There was a slap tear present when he had the surgery. He worked up until that surgery. So a good firefighter should have been awarded long-duty disability benefits. We actually reversed the decision of the pension board based on that. Thank you, Your Honor. Thank you.